Whitaker, Judge,
dissenting:
I cannot agree with the opinion of the majority. The purchaser of a refrigerator got for his money, not only a refrigerator, but also the seller’s agreement that it would keep the refrigerator in good repair for a period of five years. This was an obligation over and beyond the usual manufacturer’s warranty of its product.
There is an implied warranty on every sale by a manufacturer that the article is free from defects in workmanship and material. Many times these defects can be discovered only from a use of the article, and in the custom of the various trades certain periods of time are allowed for these defects to show up. If they show up within the time allowed, the manufacturer must remedy them at his own expense. If they do not show up within this time, it is presumed the break-down was not occasioned by faulty manufacture, but by something else, in which event the maker is relieved from responsibility.
In the case of automobiles, for instance, the warranty time is ordinarily 90 days, but in the case of an electric refrigerator the standard time is one year. If the machine becomes defective after the expiration of one year, the purchaser must make the necessary repairs at his own expense.
This was the rule obtaining in the case of defendant’s refrigerators until the year 1933. If, prior to that time, one of their refrigerators went bad after it had been in *471 use for: more than a year, it had to be repaired at the expense of the purchaser. Ordinarily the purchaser had the repair work done by the retail dealer or the distributor, but sometimes it was done by an outside party; but in any event it was done at the purchaser’s expense.
The quality of the repair work thus done and the cost of it was causing an unfavorable reaction toward plaintiff’s machines, and partly for this reason plaintiff decided to make available to a purchaser its own repair facilities. At first it offered to a purchaser an agreement to keep the machine in repair for one year after the expiration of the warranty period, or for two years, or for three years, as the purchaser might elect; or the purchaser might refuse all of these proffered agreements, and have any necessary repairs made by any person he might choose.
If the purchaser accepted any of the agreements offered by plaintiff, he was required to pay therefor $6.00 per yean If the purchaser took the three-year agreement, it would thus cost him $18.00.
Plaintiff then in 1935 determined it could offer a purchaser a four-year agreement and at the price of $10.00, instead of the former price of $18.00 for three years. This it did. Some purchasers took advantage of it and some did not.
In the following year, 1936, plaintiff concluded that if all of its purchasers of refrigerators took its four-year maintenance agreement, it could further reduce its price to $5.00. Since under previous plans a substantial number of purchasers of refrigerators had not accepted the maintenance agreements, plaintiff, in order to put the $5.00 plan into effect, found it necessary to require that all purchasers of refrigerators enter into the maintenance agreement. So, from then on what had before been optional, now became obligatory; but the price of the agreement was reduced to $5.00. It was thus successively reduced from $18.00 for a three-year agreement to $10.00 for a four-year agreement, and then to $5.00 for a four-year agreement.
From this recitation of facts it would seem apparent that what the plaintiff sold was not only a refrigerator but also an agreement to keep the refrigerator in good condition for four years, in addition to the warranty period of one year.
*472 This was of value to the purchaser and it cost the plaintiff a substantial sum of money to fulfill it. Just how much it had cost purchasers to keep their machines in repair prior to 1933 does not appear, but plaintiff’s agreement must have saved them a considerable sum because 93 percent of the multiple-unit purchasers, who had the option of entering into the agreement or not, entered into it.
The record does show that it cost plaintiff $4,628,797.83 to fulfill its obligation under the agreements. This was an average cost of $65.00 for each unit repaired. That plaintiff was able to enter into an agreement to repair for $5.00, whereas it cost it $65.00, is explained by the relatively small •number of machines that needed repair within the contract term. The total amount collected on the agreements was $10,687,115.00.
It is true that plaintiff made a profit of more than 100 percent on the agreements, but it cannot be said that an agreement which it cost plaintiff $4,628,797.83 to perform was not something substantial over and above the sale of the refrigerators. Except for these agreements, plaintiff would hot have been required to expend this $4,628,797.83.
Nor can it be said that the purchaser did not receive something of substantial value in addition to the refrigerator when he paid $5.00 for plaintiff’s agreement to do something which might cost it $65.00 to do.
' Evidently these agreements were not a subterfuge to •increase the price of the refrigerators.
It may be further said that on all sales of refrigerators these repair agreements were invoiced separately, and the amounts received from them and the cost of their performance were entered on plaintiff’s books in an account separate from the account of refrigerator sales.
The cases relied on by defendant are not controlling. In Lash's Products Company v. United States, 64 C. Cls. 252, aff’d., 278 U. S. 175, the purchaser secured for his money only the article purchased, which in that case was a soft drink. In that case the Supreme Court said, “The amount added [to the purchase price] because of the tax is paid to get the goods and for nothing else.” That is not true here. The purchaser got something in addition to a *473 refrigerator. He got an agreement to keep it in repair for four years, in addition to tbe customary warranty period. If an automobile dealer agrees to keep my car in repair for four years, can it be said that he has sold me nothing but an automobile?
It is also obvious that the selling and advertising expenses that go into the price of an article are not things the purchaser gets in addition to the product — which was the question involved in Fitch Company v. United States 323 U. S. 582.
This opinion is in line with rulings of the Internal Revenue Service in comparable cases.
In S. T. 943, 1952 — 1 C. B. 221, pencils subject to tax “were sold by the manufacturer as a unit” with spring loaded reels or notebooks not subject to tax. The Bureau ruled that the tax attached only to “that portion of the manufacturer’s sales price of the unit which is properly allocable to the taxable article.”
Rev. Rul. 204, 1953 — 20 I. R. B. 25, a retailer of taxable silverware gave to the purchaser a non-taxable article, as a sales incentive. It was ruled that the transaction con-: stituted a sale of the silverware and a non-taxable article at a lump sum price, and that the tax should be measured only by the portion of the total amount received that was attribute able to the silverware. Clearly the purchaser here had to pay. the full amount to get the silverware and could not obtain the non-taxable article separately. But the tax.- was not imposed upon the full amount paid by the purchaser because, for that amount the purchaser received something other than the taxable article. : •
■ In Rev. Rul. 224,1953 — 211. R. B. 16, phonograph mech-, anisms, which are taxable under section 3404 (b) of the Im ternal Revenue Code, were combined with player attachments, which were not taxable, and were sold as a unit for a single price. The tax was ruled to apply only to the portion, of the price attributable to the mechanism, notwithstanding the mechanism and the attachment were intended to be used together and the particular mechanism could be obtained only through payment of an amount that included the- price of the non-taxable attachment.
*474 See also S. T. 572, XI-2 C. B. 469, 1932; and Rev. Rul. 54-100, 1954—11 I. R. B. 12.
I am authorized to say that Judge Littleton joins in this dissenting opinion.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Bichard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, General Motors Corporation, at all times material to this cause of action, was and is a domestic corporation organized and existing by virtue of the laws of the State of Delaware with its principal place of business in the City of Detroit, Michigan.
2. Frigidaire Division of the plaintiff is, and since January 1,1934, has been, a division or branch of the plaintiff with its principal office at Dayton, Ohio. Prior to January 1, 1934, and since January 1, 1928, the business operations thereafter conducted by Frigidaire Division of the plaintiff were conducted by Frigidaire Corporation, a wholly owned subsidiary of the plaintiff.
3. The principal business of the Frigidaire Division is the manufacture and sale of electrical appliances. During the period of the claim in this action, May 10, 1937, through December 31, 1941, it manufactured and sold the following products: household refrigerators, electric ranges, electric water heaters, compressors or coils for commercial refrigeration, water coolers and water cooler tanks, beverage coolers, ice cream cabinets, milk cooler units, air conditioning equipment, store and room coolers, evaporating condensers "and duct units, cooling units for soft drink equipment, mobile refrigeration and air conditioning equipment units, sealed units for replacements in refrigerators, water coolers, beverage coolers, ice cream cabinets and self-contained air conditioners, and service parts and accessories.
4. During the period of the claim in this action, certain of the articles manufactured and sold by the plaintiff were subject to the manufacturer’s excise tax imposed by Section 608 of the Bevenue Act of 1932 until March 1939, and thereafter. by Section 3405 of the Internal Bevenue Code. The *475 plaintiff duly filed returns and paid manufacturer’s excise taxes upon its sales, of such articles within the following periods during which each was subject to tax:
Household refrigerators_ May 10,1937, through December 31,1941.
Water coolers_ Ice cream cabinets_ Beverage coolers_ Self-contained air conditioners. October 1,1941, through Decem- * ber 31, 1941.
The taxes so paid amounted to $9,891,600.23 and are not in dispute in this action.
5. The Commissioner of Internal Revenue has assessed and the plaintiff has paid additional manufacturer’s excise taxes for the period of May 10, 1937, through December 31, 1941, in the amount of $537,886.02, plus interest in the amount of $34,733.19. The payments were made to the Collector of Internal Revenue at Cincinnati, Ohio, on the dates and in the amounts as follows:

The basis for such additional taxes was the inclusion by the Commissioner as a part of the selling price of the various appliances of an amount received by the plaintiff on account •of a Protection Plan (hereinafter more particularly described both as to its nature and to its relationship to the selling price) on the various products referred to in finding 4, during the period each was subject to tax and on replacement units for such products. The total amount received by the plaintiff from this source on which the additional tax was computed aggregated $10,687,115.
6. On October 9,1943, the plaintiff duly filed, pursuant to the applicable law and regulations, a claim for refund, and thereafter filed supplemental information in support of its -claim with respect to the additional taxes and interest de *476 scribed in finding 5, in tbe total amount of $572,619.21. The claim for refund read in part as follows:
Section 3313 of the Internal Revenue Code (R. S. Section 3228 (a) as amended by Section 619 (c) of the 1928 Act, and Section 1106 (a) of the 1932 Act) provides that claim for refund of the aforementioned taxes may be filed at any time within four years next after the payment of such taxes. This claim for refund may therefore be filed at any time prior to October 10,1943, and it is accordingly a timely claim.
Claim is hereby made for the refund of said $537,886.02 and interest of $34,733.19 plus interest as provided by law on both said amounts from the respective dates of payment.-
The taxpayer claims that said tax and interest has been erroneously and illegally assessed and collected because the $5.00 charge made by the taxpayer in respect of the additional four year warranty contract under which it sold its refrigerators during the periods in question was not subject to the tax imposed by Section 608, Revenue Act of 1932, as amended, and Section 3405 of the Internal Revenue Code as amended.
If the Commissioner takes the position that the $5.00 warranty charge was an item or element in the price of the refrigerators as the basis for excise tax, then in the ’ alternative taxpayer claims that said taxes and interest have been erroneously and illegally assessed and collected at least to the extent of the value of the four year warranty service.
7. On January 4,1946, the Commissioner by letter sent by registered mail rendered a decision rejecting and disallowing the claim for refund referred to in finding 6.
8. The plaintiff has not included any excise tax on the amount received by it for the Protection Plan, either as a charge for the Plan or as part of the price of the products covered by such Plan, and has not collected the amount of any such tax from the purchasers of its products. However, the Commissioner collected taxes on the amount received for the Protection Plan only on the basis of 1/llth, l/21st, or 5.5/105.5ths thereof depending upon the rate of tax in effect at the time of the sale of the appliance.
9. The Protection Plan is an agreement by the plaintiff to repair or replace the refrigerating unit in a product manufactured by it in the event such unit becomes inoperative *477 ■within the- first five years following the “date of delivery to the original purchaser”. The original purchaser (sometimes otherwise referred to herein as “ultimate consumer” or “original user”) referred to in the agreement is the first purchaser who becomes a user of the product; for example, the first. householder who purchases the appliance from a dealer and has it installed in the home.
10. An amount of $5, in addition to an amount designated in its price schedule as a unit price, was charged by the plaintiff on account of the Protection Plan with respect to all products and models thereof sold during the period May 10, 1937, through December 31, 1941, except self-contained air conditioners as to which the amount varied from $7.50 to $90 depending upon the size and type of the appliance.
11. In 1936 the plaintiff first offered the Protection Plan on certain of the products manufactured by it and since then has required that the Plan be purchased on every product tp which it was applicable except that where the product was purchased by a “multiple unit purchaser” the plaintiff has not required the purchase of the Protection Plan. In such latter cases the Plan has been made available at the option of the “multiple unit purchaser”. A “multiple unit purchaser” is a purchaser who buys large quantities of products manufactured by the plaintiff, such as a builder, an apartment house owner, or a national account. Regardless of whether a “multiple unit purchaser” purchased the Protection Plan, he received with each appliance purchased the standard manufacturer’s warranty of one year upon the entire product.
. 12. The plaintiff’s agreement under the Protection Plan and under the “One-Year Warranty” is evidenced by a certificate captioned “5-Year Protection Plan.” The certificate contained the following provisions:
■'■Five-Year Protection Plan — We Warrant every new 1936 Frigidaire Household Sealed-In Mechanical Unit to be free from defects in material and workmanship under normal use and service, and we will, within five years from date of delivery to the original purchaser,. replace without any cost to the customer, any Sealed-In Mechanical Unit which our examination shall disclose to our satisfaction to be thus defective, provided, how-oyer,.that by so doing we shall not be obligated to replace *478 the complete refrigerator. The foregoing applies only to the Sealed-In Mechanical Unit under conditions specified herein, and does not apply to any other parts of the Frigidaire equipment mentioned hereinafter.
One-Year Warranty — We Warrant every new 1936 Frigidaire Household Cabinet, temperature control, fan, and starting relay to be free from defects in material and workmanship under normal use and service, and we will, within one year from delivery to the original purchaser, replace without any cost to the customer, any part or portion thereof which our examination shall disclose to our satisfaction to be thus defective. After one year from date of delivery to the original purchaser a charge will be made for any adjustments or service call (other than for the replacement of the Sealed-In Mechanical Unit as stated herein above) whereby the Frigidaire is made to operate satisfactorily, and for any repairs to the cabinet, its finish, the temperature control, the fan, or the starting relay.
13. The certificate setting forth the plaintiff’s obligations under the Protection Plan and the One-Year Warranty is packed at the factory in an ice cube tray of the refrigerators and in a similarly secure place inside other products. That certificate remains with the product until it reaches the ultimate consumer. Upon installation of the appliance the installing dealer usually inserts on the certificate the cabinet and mechanical unit serial numbers and delivers the certificate to the ultimate consumer.
14. The agreement under both the One-Year Warranty and the Protection Plan constituted an obligation of the plaintiff to the ultimate consumer. The agreement was for the benefit of the user of the product protected and the period of the plaintiff’s performance under the Protection Plan commenced one year after delivery of the protected product to the first user thereof.
15. During a portion of the period here involved the plaintiff included in a container in each of its products covered by the Protection Plan a questionnaire card requesting certain statistical data from the ultimate purchaser. While this card urged the purchaser to fill out and return the card to the plaintiff in order to register the Protection Plan with the plaintiff’s factory, the information contained on the card was used by the plaintiff only for sales and statistical pur *479 poses and neither the execution nor the return of the card was necessary to impose liability upon the plaintiff under the Protection Plan.
16. The physical activities of the plaintiff and others acting under its direction in discharging the plaintiff’s obligations under the Protection Plan related exclusively to the reoperation of the refrigerating unit.
The amounts received by the plaintiff by reason of the Protection Plan were to cover services and obligations to which the plaintiff committed'-- itself under the Plan and to cover expenses which would result in fulfilling these commitments. Neither the amount which the purchaser of a product was required to pay on account of the Protection Plan nor the expenses which the plaintiff expected to incur in performing its obligations under the Protection Plan entered into the unit prices (see finding 36) which the plaintiff otherwise charged for its products in 1936 when the Protection Plan was instituted or at any time thereafter.
17. The practice by a manufacturer of warranting his product has often been followed. The period of such warranty has varied depending upon the nature of the product and the use to which it is normally put. In the refrigeration industry, by the late 1920’s, one year had come to be recognized and observed by most manufacturers as the appropriate period of that warranty. The plaintiff adopted the One-Year Warranty for its products about the middle of the 1920’s and has continued that warranty until the present time. It extended to material and workmanship of the entire product. No separate charge has ever been made by the plaintiff for this warranty and at all times an amount calculated to cover the probable expense thereunder has been set up as a reserve, allowance for which has been made in the price of the manufactured article. The plaintiff’s method of calculating this reserve has varied. Originally a fixed figure of $1 or $2 was allowed but in more recent years a percentage of manufacturing cost has been set aside to cover probable expenses under the One-Year Warranty.
18. Performance under the One-Year Warranty was and is carried out under a joint arrangement between the manufacturer and the dealer who sells the product to the original *480 user.' The former supplies the necessary material and absorbs the transportation expenses in connection with such material, while the dealer is responsible for other labor and installation charges.
- 19. The reserve established by the plaintiff for the One-Tear Warranty is charged with all expenses incurred by the plaintiff in performing the One-Year Warranty obligation and is closed out as an item of profit or loss on current operations.
20. During the period May 10, 1937, through December 31, .1941, the plaintiff continued to give the standard manufacturer’s warranty of one year on its products. A charge for this warranty was not separately billed and accounted for but was computed into the sales price of the products which was used as the basis for the excise tax paid by the plaintiff. This warranty protected for a one-year period the refrigerating mechanism, the cabinet, temperature control, and starting relay, and parts thereof.
21. Until 1933 independent dealers and, in some cases, distributors, who sold the plaintiff’s products but were otherwise unaffiliated with, the plaintiff, performed the bulk of the repair service required upon products manufactured by the plaintiff following the expiration of the manufacturer’s One-Year Warranty;
22. In 1933 the plaintiff became dissatisfied with the quality and cost of the service rendered by numerous of its dealers and distributors and determined to expand its own facilities and enlarge the scope of its own repair operations with the objective Of providing for'all the users of its products a high quality and low priced service. Since the late 1'920’s the plaintiff had provided some repair services at Dayton but had confined itself principally to selling service parts to dealers and others.
23. To carry out the objective described in finding 22, the plaintiff commenced to sell Service Agreements on its products in the latter part of 1933.- Similar agreements, sometimes called Repair or Maintenance Agreements, had been widely used by dealers and distributors in the servicing of refrigeration producís, and the plaintiff had encouraged the sale and use of such agreements: •
*481 24. Under the “Frigidaire Service Agreement” which, it sold from late 1933 through 1935, the plaintiff agreed to repair, adjust and maintain as necessary the mechanical refrigerating unit on any product with respect to which the Agreement was purchased. The Agreement was sold to cover a period of one, two, or three years following the expiration of the manufacturer’s -One-Year Warranty at a cost of $6 per year and its purchase was optional with all purchasers of products manufactured by the plaintiff.
25. To enable it better to perform repair services tinder the Service Agreements it sold, the plaintiff established repair service stations in Newark, New Jersey; Kansas City, Missouri ; and Oakland, California, in- addition to the shop already in operation in Dayton, Ohio.
26. In 1935 the plaintiff introduced and began to sell another type of Service or Maintenance Agreement called a “Four-Year Replacement Contract”. The plaintiff limited this agreement to the rotary type of mechanical refrigerating unit which powered certain of the products sold by it. Under this agreement the plaintiff undertook to replace such unit in the event it became inoperative within four years following the expiration of the manufacturer’s One-Year Warranty. The cost of the agreement was $10 and its purchase was optional with the purchaser of products manufactured by the plaintiff.
27. No manufacturer’s excise tax was assessed or collected on the amounts received by the plaintiff from the sale of Frigidaire Service Agreements and Four-Year Replacement Contracts in 1933, 1934, and 1935, although the products which they covered were subject to such tax.
28. In 1936 the plaintiff discontinued the sale of both the Service Agreement and the Four-Year Replacement Contract and instituted the ' Protection Plan. Whereas the former agreements had been sold by the plaintiff at the option of all purchasers of its products, with the institution of the Protection Plan the plaintiff required that all purchasers of its products, except multiple unit purchasers, pay in addition to the prices listed for its products an amount (usually $5) on account of the Protection Plan. By the payment of such an amount such purchasers become entitled *482 to tbe benefits of the Protection Plan. The plaintiff’s purpose in instituting the Protection Plan for the agreements previously offered on an optional basis and requiring all purchasers except multiple Unit purchasers to come under the Protection Plan was to make better repair service available to all users of its products at a reduced charge.
29. The plaintiff expected to increase substantially the number of participants in its service program over the number that had participated when the Service Agreements were offered on an optional basis. By thus broadening the coverage the plaintiff expected that it would be called upon to repair a smaller percentage of protected units than it had been required to repair under the optional plans previously sold by it.
The plaintiff also expected that the volume of repair business assured it through the increased number of participants would permit a substantial reduction in the unit cost of the services it was obliged to perform under the Protection Plan, and had been obliged to perform under the Service Agreements sold in the three previous years.
30. The amount which each purchaser of a household refrigerator or other product has been required to pay on account of the Protection Plan since its institution in 1936 has been $5 (except for self-contained air conditioners as to which total collections during the period involved in this suit were $450), that is, a 50 percent reduction from the amount such purchasers were required to pay under the Four-Year [Replacement Contract sold by the plaintiff on an optional basis in 1935. The amount purchasers were required to pay on account of the Protection Plan resulted from the plaintiff’s determination that the probable cost for the repair of a single unit would be approximately $25 and that not more than 20 percent of the units sold would become inoperative during the four-year period of the Protection Plan. On that basis it was determined that $5 from each purchaser of its products would meet the anticipated costs.
31. The plaintiffs institution of the Protection Plan and its decisions as to products to be covered and the extent to which purchasers of its products should be required to pay the additional amount on account of the Protection Plan *483 were not influenced by the imposition of the manufacturer’s excise tax. During various portions of the period involved in this proceeding the plaintiff sold five products — water coolers, beverage coolers, ice cream cabinets, self-contained air conditioners, and replacement units — which were not subject to the manufacturer’s excise tax but were nevertheless subject to the requirement for the payment of a fixed amount on account of the Protection Plan. Likewise, during the period involved in this suit, it sold three products which were subject to the excise tax — electric ranges, water heaters, and truck units — as to which the One-Year Warranty but not the Protection Plan was applicable.
32. During the entire period of the claim in this action, May 10, 1937, through December 31, 1941, the plaintiff’s products were sold to ultimate users through the following distribution system:
(a) The plaintiff sold all its products for domestic use to its wholly owned subsidiary, General Motors Sales Corporation, Frigidaire Division.
(b) General Motors Sales Corporation, Frigidaire Division, sold in turn to independent distributors, whose number varied from 26 to 30.
(c) General Motors Sales Corporation, Frigidaire Division, also maintained branches, varying in number between 20 and 25, which operated as distributors of the plaintiff’s products in territories not covered by independent distributors.
(d) The independent distributors and the branches of General Motors Sales Corporation, Frigidaire Division, sold in turn:
(i) to independent dealers whose number varied between 8,000 and 8,500;
(ii) directly to multiple unit purchasers; and
(iii) occasionally to ultimate consumers.
(e) The great bulk of the sales of the plaintiff’s products to ultimate consumers was made by one of the dealers who had previously purchased either from an independent distributor or one of the branches of General Motors Sales Corporation, Frigidaire Division.
*484 33. The plaintiff was credited each month by General Motors Sales Corporation, Frigidaire Division, with the total amount applicable to Protection Plans on products shipped by the plaintiff during the month. The amount so credited was separate and apart from such amounts as the Sales Corporation credited the plaintiff on account of products shipped to the Sales Corporation during the month.
34. The plaintiff made sales for domestic use of products covered by Protection Plans only to General Motors Sales Corporation, Frigidaire Division.
35. General Motors Sales Corporation, Frigidaire Division, and all its branches, as a regular practice on all invoices . rendered throughout the period of the claim covered by this action billed the Protection Plan separately from the unit price of the products which the Plan protected. An invoice dated July 31, 1941, showing the information set out below, is illustrative of the manner in which the products and the ■ Protection Plan were billed by the Sales Corporation: '

The ranges listed in the invoice did not come under the Protection Plan but the first five items, consisting of fifty-four units, came under the Protection Plan and, at $5 each, made the amount of $270 shown on the invoice for the Protection Plan.
36.General Motors Sales Corporation, Frigidaire Division, as a regular practice throughout the period of the claim involved in this action issued price schedules to its distributors. Such schedules had two principal purposes: (first) to establish the unit prices at which the Sales Corporation would sell products manufactured by the plaintiff; *485 and (second) to suggest for such products cash installed unit prices to the ultimate consumers after making due allowance.f or distributor and dealer mark-ups. These latter prices were suggested prices which might be made by the dealer or other party who sold to the ultimate consumers hut the prices shown on the' schedule to the distributor were firm figures at which sales between the General Motors Sales Corporation, Frigidaire Division, and the distributor were made so long as the price list remained effective. On the schedule, preceding the prices listed, appeared this notation:
(Following prices are exclusive of the $5.00 charge for the additional four-year warranty on the mechanical' units as included in the Five-Year Protection Plan.)
Following the prices appeared this notation:
Note: There will be added to the above prices on Household Cabinets with sealed-in mechanical units a charge of $5.00 for the four-year unit replacement included in the five-year protection plan on the sealed-in mechanical unit.
• 37. Each of the twenty to twenty-five branches of the General Motors Sales Corporation, Frigidaire Division, issued price lists for its dealers during the period of the claim in this action. These price lists likewise listed the price at which the branch would sell the products manufactured by the plaintiff to dealers and suggested the price at which the dealer might sell such products to their customers. These lists also contained notations similar to those referred to in the preceding finding with respect to the amount of $5 for the Protection Plan.
- 38. Neither the plaintiff nor General Motors Sales Corporation, Frigidaire Division, nor any of the branches thereof, controlled or directed the operations or practices of the independent distributors and dealers who sold the products manufactured by the plaintiff. However, General Motors Sales Corporation, Frigidaire Division, did, as a regular practice, advise and consult with the independent distributors and, on occasion, with dealers on matters of common interest. So far as the Protection Plan was concerned, the Sales Corporation and the branches thereof suggested *486 and advised that it should be handled as an item independent from the product it protected.
39. The independent distributors who numbered between' twenty-six and thirty during the period of this claim, as a regular practice billed the amount for the Protection Plan as a separate item apart from the unit price of the product' which the plan protected on all invoices rendered whether to dealers or ultimate customers.
40. The independent distributors, as a regular practice, issued price schedules to the dealers to whom they sold. These schedules served the same purposes and were issued in a similar manner as those issued by the branches of General Motor Sales Corporation, Frigidaire Division, heretofore described.
41. The practices of the independent dealers who numbered between 8,000 and 8,500 during the period of this claim were not uniform with respect to the manner in which the products which included the Protection Plan were invoiced to their customers. Some itemized the amount for the Protection Plan separate from a unit price for the product, while others rendered a bill in a single amount which included both a unit price for the product and for the Protection Plan. The dealers generally made known to prospective customers by various means, including newspaper advertisements, oral conversations, display matter and price tags, the general nature of the Protection Plan and the fact that included in the total amount paid was an amount (usually $5) on account of the Protection Plan.
42. In some instances the commissions paid to salesmen who sold the plaintiff’s products to the ultimate consumer, and which products were subject to the Protection Plan, were based on the total amount paid at the time of the purchase, including the amount paid on account of the Protection Plan, whereas in other instances the commissions were based on the amount paid by the ultimate consumer at the time of the purchase, exclusive of the amount paid on account of the Protection Plan.
43. The amount of $5 fixed for the Protection Plan, as heretofore described, has been reexamined by the plaintiff at *487 regular intervals. The factors considered by the plaintiff in such reexaminations have been • the acceptability of that amount by purchasers of the plaintiff’s products and services, the percentage of defectives that have been experienced in the past and might be expected in the future, and the costs of performing repair and reoperation services.
44. In 1936 when the Protection Plan was instituted, the plaintiff offered it on an optional basis with respect to 1935 models as yet unsold to the ultimate consumer. Out of a total of 12,000 products as to which the option to purchase the Protection Plan was thus extended, the option was exercised and the Plan purchased with respect to approximately 7,000.
45. During the period of this claim approximately 100,000 household refrigerators were sold to multiple unit purchasers by the New York Branch of General Motors Sales Corporation, Frigidaire Division. All such purchasers were extended an option to buy the Protection Plan, but none were required to buy. The Plan was purchased to cover approximately 93,000 such units, and was rejected in 7 percent of the cases.
46. Because of the plaintiff’s practice of changing its models annually, its experience as to rate of defectives on earlier models has provided merely an indication, not an accurate guide, as to future experience.
47. The price at which maintenance and repair agreements have been sold by others in the refrigeration industry, both prior to 1936 and since then, has been substantially higher than the price applicable to plaintiff’s Protection Plan, as heretofore described. For example, a one-year contract covering switches, relays, and electrical cords has sold for approximately $4, and a one-year contract applying to switches, relays, and cords and to the sealed-in mechanical unit following the expiration of the Protection Plan has sold at a charge of between $8 and $15.
48. All of the amounts collected by the plaintiff for Protection Plans were credited to a special account called “Protection Plan — Warranty Keserve”. Protection Plan collections were the only amounts credited at any time to this account.
*488 • 49. Of the total amount for Protection Plans which are théjbásis for theiclaim in this action, (found in finding 5 to be $10,687,115) i $81,125 represents ■ collections applicable to Plans sold on replacement units for household refrigerators which units were not subject to manufacturer’s excise tax at any time during the period of the claim in this action, and approximately $465,000 represents collections on Protection Plans sold on an optional basis by the New York Branch of Frigidaire Sales Corporation to multiple unit purchasers.
50. All of the expenses incurred by.the plaintiff in per? forming its agreement under the Protection Plan were charged to the special account, “Protection Plan — Warranty Reserve.” No other expenses were charged to this account. Within this account both collections and expenses were segregated in accordance with'the product line and model year to which they were applicable..
51. As heretofore shown, the total collections on account of Protection Plans which are the basis for the claim in this proceeding were $10,687,115. The total expenses incurred by the plaintiff in performing its obligations under the Protection Plans, the collections from which form the basis of the claim in this proceeding, amounted to $4,628,797.83. These expenses were as follows:
The total amount of the cash payments made by the plaintiff to distributors and dealers for their services in connection with the repair and replacement of inoperative units_ $846,375.27
Freight charges paid .by the plaintiff to common carriers incident to the repair and replacement of inoperative units_ 372,252.74
Other Expense: ■
Unit Reoperation (less compressor)_ 1,803,126.93
Compressor_1,062, 651. 01
Units Scrapped_ 66, 614.65
Tools and Equipment_____ 68, 603.33
Experimental_ 5,113. 75
Commercial Expense_i_ 331,313. 87
Obsolete and Unsalable Stock Scrapped_ 25,268.28
Miscellaneous_ 47,478. 00
Total_J._ 4,628, 797. 83
*489 . The average expense to the plaintiff for the repair of a single defective or inoperative unit during the period of this claim was $65. • /'
.. 52. The “Protection Plan — Warranty. Reserve Account” is segregated by model lines. This account is reviewed by the plaintiff frequently. At the end of a given period, when it is felt that all obligations under the 'Protection Plains involved are completed, any'credit balances remaining : in the account are closed out'to ah' account designated “Miscellaneous Income Account” which is.'a type óf profit and loss account.
CONCLUSION <5P ■LAW'.
Upon the foregoing findings; .of. fact., which are made a part of the judgment herein, the court concludes as.a matter of law that plaintiff is entitled to recover. Entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due the plaintiff in accordance with the foregoing opinion and' the findings of fact.